## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

LYNN MORRIS,                                    :
           Plaintiff,                        :
                                  :
           v.                                :        C.A. No. 11-625S
                                  :
MICHAEL J. ASTRUE,                              :
COMMISSIONER OF SOCIAL SECURITY,                :
           Defendant.                        :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

      This matter is before the Court on the Motion of Plaintiff Lynn Morris ("Plaintiff" or

"Ms. Morris") for reversal of the decision of the Commissioner of Social Security (the

"Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3) (the "Act").  Plaintiff contends that the decision of the administrative law judge

("ALJ") was infected by errors of law and not supported by substantial evidence; she now seeks

to reverse the decision of the Commissioner.[1]  Defendant Michael J. Astrue ("Defendant") has

filed a Motion for an order affirming the Commissioner's decision.

      This matter has been referred to me for preliminary review, findings and recommended

disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  The Court finds no error in the ALJ's

discounting of Plaintiff's testimony regarding pain and functional limitations based on his

credibility assessment or in his failure to mention post-traumatic stress disorder ("PTSD") at

---

[1] Plaintiff's Application claimed that her asthma is a disabling condition; this claim was denied initially and on reconsideration, as well as by the ALJ.  Plaintiff does not dispute the ALJ's findings regarding asthma.  ECF No. 9 at 3.  Based on this admission, Defendant's Motion to affirm with regard to asthma may be GRANTED.

Step Two in that this condition was effectively referenced in the finding of severe anxiety and, in any event, was plainly considered in assessing Plaintiff's mental limitations.  The Court further finds that any error in the evaluation of the functional limitations caused by carpal tunnel syndrome is harmless.  Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 9) be DENIED and the Commissioner's Motion for an Order to Affirm the Decision of the Commissioner (ECF No. 11) be GRANTED.

## I.     **Background Facts**

Plaintiff Lynn Morris was born in 1980.  Tr. 18.  She was twenty-seven as of the alleged onset of her disability on September 30, 2008, and thirty as of the ALJ's decision.  Tr. 14, 18.  She has an eighth grade education.  Tr. 31.  Her relevant diagnoses include anxiety, depression, PTSD, carpal tunnel syndrome and arthritis; however, she has many other diagnoses, most of which are not central to her application.  Tr. 29-30.  From the age of eighteen until 2008, Plaintiff worked as a security guard, cashier and waitress, earning between $4,421 and $7,909 annually from 1999 to 2001, and, with the exception of 2003 (when she earned $6,827), between $11,890 and $17,375 annually from 2002 until 2008.  Tr. 116.  She left her last job due to limitations arising from pregnancy and has not tried to get employment since.  Tr. 32.  Rather, a self-described "stay at home mother," Tr. 391, she has been at home caring for her four children, ages thirteen, eleven, ten and two, and her 300 pound adult brother-in-law, who suffers from Down's Syndrome.[2]  Tr. 16, 18, 31, 37, 462.  She lives in a third floor apartment with her husband and manages the stairs, at times carrying her baby.  Tr. 31, 412.  While she testified that she does not cook or clean – her husband performs those tasks – she also said the reason was because she spends her time on the couch due to lack of motivation.  Tr. 36-37, 45.

---

[2] Plaintiff did not disclose that she had been taking care of her fifty-one-year-old brother-in-law either in her application or at the hearing on April 26, 2011.  Tr. 28-50, 107-13, 159-66.  That information was extracted from her medical records, which reflect her complaints about the strain on her caused by his care.  Tr. 462, 515, 628, 684.

Inconsistently, her medical records reflect wide variations in her descriptions of her level of activity.  For example, during a psychiatric evaluation on October 16, 2009, she said she prepares meals and manages childcare responsibilities.  Tr. 462.  On December 8, 2009, she told her physical therapist she could shop and clean the house without difficulty.  Tr. 601.  To some medical professionals, she reported that she "will clean the whole house" during times of "high energy" several times a week, while she told others that she has difficulty cleaning due to low motivation.  Tr. 462, 633.  By contrast with her testimony, her communications with her medical providers are replete with complaints that she does all the work in the home, including lifting her 300-pound brother-in-law in and out of the bathtub, while her husband refuses to help.  Tr. 493-96, 515, 597-98, 633-34, 639, 641-42, 644, 646, 654.

Plaintiff's medical record is extensive.[3]  It is presented here organized by category of claimed impairment.

### A.  Carpal Tunnel Syndrome

On September 27, 2007, Plaintiff had a neurophysiologic consultation with Dr. Thomas McGunigal for numbness and tingling in her right hand.  Tr. 399-405.  She reported having had carpal tunnel symptoms during pregnancy six years earlier, which resolved after the birth.  Tr. 399.  Despite suffering from these symptoms for four months, she had been able to continue working as a cashier, although the work seems to have brought on the symptoms.  Id.  Dr. McGunigal diagnosed "[m]oderate chronic right carpal tunnel syndrome."  Tr. 400.  He

---

[3] The sheer size of the medical record is significant with respect to Plaintiff's credibility in reporting medical issues. For example, her records from the Landmark Medical Center emergency room for a two-year period from July 2007 to July 2009 reflect sixteen visits, mostly for complaints totally unrelated to the matters covered by her application, such as congestion, coughs, a sore throat and a dog bite.  Tr. 205-390.  In the same vein, her records from Sturdy Memorial Hospital reflect that in one three-day period in August 2009, she was seen at the Landmark emergency room, by her primary care physician, at Memorial Hospital twice and then at the Sturdy Memorial emergency room, all for shortness of breath; her symptoms responded positively to nebulizer treatment or other asthma medication. Tr. 569, 586.  In another example, she presented at Memorial complaining of a foreign body stuck in her throat after eating chicken; x-rays of two views of the neck revealed nothing.  Tr. 545.

administered a cortisone injection "with good result;" he suggested future injections whenever the pain returned.  Tr. 398, 400.  She visited Dr. McGunigal on May 1, 2008, for a repeat injection.  Tr. 398.

After her pregnancy, on June 24, 2009, she complained to Dr. Cristina Pacheco of pain, numbness and weakness in her right hand, causing her to be fearful of carrying her baby down stairs.  Tr. 412.  She was sent back to Dr. McGunigal, who found her symptoms worse than they had been in 2007 and diagnosed "[m]oderate to severe chronic right carpal tunnel syndrome." Tr. 391-97.  He recommended a trial of a wrist splint worn at night.  Id.  He also suggested that Plaintiff return for a cortisone injection after she finished nursing her child; however, the record is devoid of any suggestion that she ever did so.  See id.  Instead, Plaintiff apparently switched to Dr. Jerrold Rosenberg, whom she had been seeing for back pain.  On March 8, 2010, she saw him, complaining of a "new onset of hand pain, burning, and night time numbness."  Tr. 609. After conducting a nerve study, Dr. Rosenberg diagnosed "moderate bilateral carpal tunnel syndrome affecting sensory nerve fibers with demyelinating pathology," but "no electrical evidence for a radiculopathy."  Tr. 612.

### B.  Degenerative Disc Disease and Chronic Pain

The earliest reference to back pain in the record is in notes from June and August 2007 of Dr. Margaret Koehm of Memorial Hospital, who Plaintiff saw for low back pain, that got worse when lifting at her job at Walmart.  Tr. 441-42.  Dr. Koehm prescribed Vicodin, Robaxin, Flexeril and Motrin, and recommended physical therapy.  Tr. 441-42.  There is no evidence from 2007 or 2008 that Plaintiff pursued physical therapy.  Next, on September 27, 2007, Plaintiff was examined by Dr. Abdul Barakat at Ocean State Pain Management for complaints of "chronic mid and low back pain;" this time, she reported that it was exacerbated by prolonged sitting, which

she had been doing for her job as a security guard.  Tr. 187.  Plaintiff reported that her pain was a

6/10 on the pain scale, but Dr. Barakat determined that she was not in acute distress.  Tr. 187-88.

He found limited lumbar range of motion but that the "active range of motion of the thoracic

spine is full and without pain."  Id.  He administered steroid injections.  Tr. 185-86.

Two years later, on September 29, 2009, Plaintiff finally began physical therapy for her

back at Memorial Hospital.  Tr. 589.  At the outset of therapy, she reported her pain as a 5/10.

Id.  Over time, the therapy resulted in steady improvement.  See Tr. 589-604.  In October 2009,

Plaintiff reported her pain as 4/10, and the therapist noted that she had achieved all of her short-

term goals.  Tr. 596.  In November 2009, she complained to her primary care physician that

physical therapy was not helping her back pain, but admitted the problem was really caused by

lifting her 300-pound brother-in-law out of the bathtub without assistance.  Tr. 515, 597-98.  By

December 15, 2009, she reported that pain had declined to 1-2/10 and her physical therapist

found that she had "regained all previous levels of past function" without any complaint of

symptoms.  Tr. 601-03.  Plaintiff failed to show up for her last physical therapy appointment and

was discharged from physical therapy with "[a]ll goals achieved."  Tr. 604.

Despite reporting a 1/10 on the pain scale on December 15, 2009, to her physical

therapist, Plaintiff saw Dr. Rosenberg on December 17, 2009, for complaints of lower back pain.

Tr. 486, 603.  Dr. Rosenberg performed a nerve conduction study and paraspinal

electromyography ("EMG") on February 18, 2010, which was "within normal limits."  Tr. 605-

08.  He noted no chronic root changes; the study suggests "a primary muscularskeletal [sic]

etiology."  Tr. 608.  Dr. Rosenbeg prescribed gabapentin and administered cortisone trigger-

point injections in April and May 2010.  Tr. 614-15.  Inconsistent with her progress with

physical therapy in late 2009, Plaintiff told Dr. Rosenberg on March 15, 2010, "not int. in PT 'did nothing.'"  Tr. 613.[4]

### C.  Depression, Anxiety and Post-Traumatic Stress Disorder

The first reference in the record to mental health issues is in a consultative report written on September 27, 2007, when Plaintiff denied depression or anxiety, but said she had a history of panic attacks.  Tr. 187.  Her first diagnosis of "situational" anxiety/panic disorder was made on August 8, 2008, after she reported moderate anxiety during a primary care visit while pregnant. Tr. 430-31.  Following the pregnancy, Plaintiff was diagnosed with postpartum depression and marital discord (her husband had moved out).  Tr. 417.  She started Zoloft and felt better.  Tr. 416.  On July 28, 2009, Plaintiff complained that she woke up with a rash due to stress because her husband recently left her again after a fight.  Tr. 407.  Dr. Pacheco increased Plaintiff's dose of Zoloft to 100 mg a day, prescribed Buspar and recommended counseling.  Tr. 408.

From September 29, 2009, through the time of her hearing in April 2011, Plaintiff attended regular counseling sessions with Elena Gaja Nehring, a licensed social worker, for panic disorder and dysthymic disorder.[5]  Tr. 487-99, 636-66.  During counseling, Plaintiff consistently reported feeling "overwhelmed by her anxiety" and "extremely stressed."  E.g., Tr. 490-91.  She described a difficult home situation in which she cared for four children and an adult brother-in-law with Down's syndrome and a difficult relationship with her husband, including his lack of help.  Tr. 490-99, 639-46.  Nevertheless, Ms. Nehring also occasionally reported progress: for example in March 2010, Ms. Nehring reported that Plaintiff "seems to be coping fairly well. She is able to laugh and smile."  Tr. 639.  During the same period, Plaintiff

---

[4] This contrasts with her testimony at the hearing, where she told the ALJ that Dr. Rosenberg "recommended me to go to physical therapy, but I just completed physical therapy, and my medical only paid for it once a year."  Tr. 34.

[5] Dysthymic disorder is characterized by symptoms of mild depression.  Dorland's Illustrated Medical Dictionary 590 (31st ed. 2007).

opined that she would be less stressed if she and the children moved out of the house because her husband was unwilling to change.  Tr. 641.  Ms. Nehring reported on March 4, 2011, that Plaintiff "reported feeling ok.  She seems happier.  Continues to feel stressed but seems to handle stress better."  Tr. 659.

Inconsistent with this somewhat upbeat note, three weeks later, Ms. Nehring filled in a residual functional capacity questionnaire, at Plaintiff's request.  Tr. 636-37.  Although her treatment of Plaintiff was entirely focused on subjective complaints with no attention to Plaintiff's ability to function in the work place, Ms. Nehring opined that Plaintiff had moderately severe impairments in the ability to "understand, carry out, and remember instructions," "respond to customary work pressures," "perform simple tasks" and "perform varied tasks," as well as severe impairments in the ability to respond appropriately to co-workers and supervisors and perform complex or repetitive tasks.  Id.  Indeed, Ms. Nehring classified Plaintiff as moderately severe or severe in every category on the form, despite inconsistent and unrelated observations in her contemporaneous therapy notes.  See, e.g., Tr. 657-60.

From April 2010 through March 2011, Plaintiff saw Dr. Henry Mann, a psychiatrist, seven times, who diagnosed Plaintiff as primarily suffering from a mood disorder.  Tr. 628-35. He also noted that she had associated issues: PTSD, regulatory disorder, attention deficit hyperactivity disorder, insomnia, and temporal lobe syndrome.  Id.  He prescribed Depakote, Abilify and Klonopin.  Tr. 632.  Among the complaints reported to Dr. Mann were panic attacks, increased depression and anxiety, periods of high energy punctuated by times when she did not want to move, the inability to go anywhere by herself, paranoia that someone is looking in her windows, terrible anger problems and no patience.  She attributed these issues to the assault she had experienced several years ago and to multiple home stressors.  Tr. 633-36.

7

In contrast to the dramatic tone of her reports to Dr. Mann, during a contemporaneous primary care visit to refill anxiety and depression medication, Plaintiff denied "sadness, crying spells, concentration problems, [or a] short temper." Tr. 671. Rather, she reported that since using anti-depressants and anxiolytics, she "notes less depression, less anxiety." Tr. 672.

## II.    <u>Travel of the Case</u>

Plaintiff applied for DIB and SSI benefits on August 17, 2009, alleging that she became disabled on September 30, 2008, due to anxiety, depression, carpal tunnel syndrome and arthritis in her back. Tr. 51-52, 107-13, 135. The Commissioner denied her claims both initially and upon reconsideration. Tr. 55-58, 64-69. She then requested an administrative hearing, which request was granted on April 26, 2010. Tr. 70-73.

On October 16, 2009, a psychiatric evaluation was performed by psychologist Sol Pittenger, Ph.D, including a clinical interview and a mental status examination. Tr. 461-65. Dr. Pittenger noted that Plaintiff's concentration appeared "grossly intact." Tr. 463-64. While her attitude was "anxious" and suggestive of a "pattern of excessive dependency," her "thought process is organized and goal-directed," "[h]er fund of information is intact" and [h]er judgment appears fair." Tr. 464. Based on Plaintiff's subjective description of her symptoms, such as persistent depression and anxiety, flashbacks, nightmares, hypervigilence associated with a sexual assault five years before and insomnia, he diagnosed major depression and PTSD, with a GAF score of 48.[6]

---

[6] A GAF of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. Text Rev. 2000) ("DSM – IV –TR"). A raw GAF score, without more, "does not give a fact finder significant insight into whether [a plaintiff] can perform some type of competitive work." <u>Querido v. Barnhart</u>, 344 F. Supp. 2d 236, 246 (D. Mass. 2004). The Sixth Circuit has held that a GAF score in the high 40s, by itself, does not preclude an individual from doing all jobs. <u>Smith v. Comm'r of Soc. Sec.</u>, 482 F.3d 873, 877 (6th Cir. 2007).

On October 22, 2009, a state agency non-examining consultant, Michael Slavit, Ph.D., reviewed the record, noted that Plaintiff stopped working at onset not due to mental health issues, but due to pregnancy, and concluded that she suffered a moderate restriction in her daily activities; moderate limitation in maintaining concentration, persistence or pace; mild limitation in maintaining social functioning; and no episodes of decompensation due to her mental impairments of PTSD and depression.  Tr. 477, 483.  This assessment was affirmed by Joseph Litchman, Ph.D., on March 13, 2010.  Tr. 564.

On November 10, 2009, a physical capacity case analysis of her back pain and carpal tunnel syndrome was performed by a state agency non-examining consultant, Dr. S. Green, who reviewed the record and concluded that the "totality of the evidence supports a history of R[ight] carpal tunnel syndrome responsive to treatment with episodes of increased symptoms . . . that is expected to be [a non-severe impairment] within 12 months of onset with treatment."  Tr. 485. He also determined that there was insufficient objective evidence of arthritis in Plaintiff's back and the fact she "cares for children at home . . . suggests she has no functional limitations."  Id. This assessment was affirmed by Youssef Georgy, M.D., on March 18, 2010.  Tr. 565.

On April 26, 2011, the ALJ conducted a hearing at which Plaintiff, represented by counsel, and vocational expert Steven Sachs, Ph.D., testified.  Tr. 11, 26-50.  The ALJ denied Plaintiff's claims for benefits on May 12, 2011, finding that she was not disabled under the Act. Tr. 8-20.  On September 2, 2011, the Appeals Council denied Plaintiff's request for review.  Tr. 4-6.  Having exhausted her administrative remedies, Plaintiff now appeals the ALJ's decision as the final decision of the Commissioner.

## III.   The ALJ's Hearing and Decision

At the hearing on April 26, 2011, Plaintiff's attorney told the ALJ she was claiming disability based on anxiety, depression, carpal tunnel syndrome and arthritis, while Plaintiff testified that she could not work due to the muscle spasms in her back, carpal tunnel syndrome, depression and anxiety, insomnia and PTSD.  Tr. 29, 33.  She explained that she could not hold a book, pick up her forty-pound baby, peel more than one potato, open jars or write, though she could carry a gallon of milk, had no problems with zippers and used the stairs to reach her third floor apartment.  Tr. 31, 38, 40, 42.  Plaintiff said she lost her job as a cashier because her employer refused to accommodate limitations caused by her pregnancy and she had not applied for work since.  Tr. 32.  She testified that her husband did most of the cleaning and cooking – not because she was in pain or because of numbness in her hand – but because she could not "motivate [herself to] do anything."  Tr. 45.  Her lack of motivation kept her on the couch, except that she regularly went out for appointments with Dr. Mann or Ms. Nehring and appointments for her children.  Tr. 36-37, 45.  Plaintiff told the ALJ that she no longer took prescription medications for pain, but rather only over-the-counter Motrin.  Tr. 36.

Relevant to her credibility is Plaintiff's answer to the question: "Do you visit with friends or relatives?"  Tr. 38.  Initially she responded with a flat "No."  Id.  Pressed by the ALJ with a series of questions, she reluctantly revealed regular visits from a neighbor and daily visits from her father.  Tr. 38-39; see also Tr. 659-60 (references to interaction with friends).  The ALJ admonished her for her lack of candor.  Tr. 39.  Also relevant is the absence of any reference to the care of her brother-in-law, who features so prominently in the notes of her counseling sessions.

In his decision, the ALJ began with the finding that Plaintiff met the insured status requirement of the Act through December 31, 2013.  Tr. 14.  He then proceeded through the

familiar five-step inquiry to determine the merits of Plaintiff's claim.  After concluding that Plaintiff was not engaged in substantial gainful activity since September 30, 2008, the alleged onset date of her disability, at Step One, he proceeded to Step Two, finding that Plaintiff had the severe impairments of chronic pain syndrome, degenerative disc disease, carpal tunnel syndrome, asthma, depression and anxiety within the meaning of 20 C.F.R. §§ 404.1520(c) and 416.920(c).  Id.  He found that the chronic back pain would limit her ability to lift and carry more than twenty pounds on an occasional basis, the carpal tunnel syndrome would limit her exertionally and affect her ability to work without wrist-immobilizing splints and her depression and anxiety would limit her ability to perform the mental demands of a job, especially one where she had to work with the public.  Id.  At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment contained in in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id.

The ALJ determined Plaintiff's residual functional capacity ("RFC")[7] at Step Four.  He concluded that Plaintiff could perform a range of light and sedentary work as defined by 20 C.F.R. §§ 404.1567(a) & (b), 416.967(a) & (b), with the following limitations:

> [The] ability to sit for 6 hours and stand/walk for 6 hours in an 8-hour workday . . . the ability to lift/carry up to 10 pounds occasionally and less than 10 pounds frequently . . . able to perform activities with her hands while wearing wrist-immobilizing splints . . . able to perform uncomplicated work tasks of up to several steps over an eight-hour workday, assuming short work breaks on average every two hours . . . not able to work with the public but can work in the presence of co-workers and engage in appropriate occasional social interaction, but cannot work in the conte[x]t of a work team where work-related interaction with co-workers is constant and physically close . . . can occasionally work with supervisors . . . able to work in conditions where levels of dust, gases, or other airborne pulmonary irritants are comparable to those in public office buildings . . . not able to work in conditions where baseline levels of irritants are higher, or where []she would be exposed to temperature or humidity extremes.

_____

[7] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

Tr. 15.  Based on the RFC and expert testimony from the vocational expert, the ALJ concluded that Plaintiff was not capable of performing any of her past relevant work.  Tr. 18.

The ALJ addressed Plaintiff's objective medical and opinion evidence in making his RFC determination, considering all symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence.  Tr.15.  For each underlying physical or mental impairment whose impact was not substantiated by credible medical evidence, the ALJ examined the totality of the record and evaluated Plaintiff's credibility in describing her limitations and pain.  Overall, the ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause some of the symptoms she described, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment.  Tr. 17.

For example, faced with evidence that carpal tunnel syndrome changed over time, the ALJ focused on the most recent diagnostic test on her wrists, which diagnosed moderate bilateral carpal tunnel syndrome and discounted her unsupported claim that she could not write or peel potatoes.  Tr. 18.  Her complaints of disabling chronic back pain were similarly unsupported by any objective evidence such as a positive finding on an MRI or EMG; rather, her EMG was "within normal limits."  Tr. 18, 608.  Moreover, she underwent injections and physical therapy, all of which was efficacious; surgery was not recommended by any physician.  Tr. 18.  Finally, while she suffered from depression and anxiety, specifically PTSD, the extent of her mental impairment seemed to be based on family and other stressors.  Her mental status examinations were mostly normal and were inconsistent with her complaints.  Tr. 18, 636-37.  In performing the latter analysis, the ALJ discounted the opinion of social worker Elena Gaja Nehring, whose

counseling notes make no reference to workplace difficulties, but who filled in an RFC questionnaire concluding that Plaintiff suffered moderately severe or severe impairment for the employment-related functions listed on the form.  Id.  He afforded more weight to the state agency consultant assessments, which were based on a review of the entire record, including the evidence of Plaintiff's daily activities, such as the care of her four children, and the lack of evidence of mental health related difficulties with work.  Tr. 18, 467-80, 481-84, 564.

At Step Five, the ALJ relied on his RFC determination and the vocational expert's testimony to find that Plaintiff was capable of making a successful adjustment to other work.  Tr. 19.  Specifically, the ALJ found that Plaintiff could perform unskilled light positions that exist in significant numbers in the national and Rhode Island/Southeastern Massachusetts economies, such as hand packager, production worker and production inspector.  Id.  Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  See 42 U.S.C. § 1382c(a)(3)(A); Tr. 21.

**IV.** **Issues Presented**

Plaintiff presents three arguments which she contends establish that the decision of the Commissioner that she is not disabled within the meaning of the Act is not supported by substantial evidence in the record and is infected by legal error:

1. The ALJ failed to consider Plaintiff's PTSD as a severe impairment;

2. The ALJ improperly evaluated Plaintiff's chronic pain and credibility; and

3. The ALJ erroneously concluded Plaintiff can perform work activities with her hands if she wears wrist-immobilizing splints.

**V.** **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. §§ 404.1529(a), 416.929(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court ... may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new
> evidence which is material and that there is good cause for the failure to
> incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is

new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and (3) there is

good cause for failure to submit the evidence at the administrative level.  See Evangelista v.

Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

A Sentence Six remand may be warranted, even in the absence of an error by the

Commissioner, if new, material evidence becomes available to the claimant.  Jackson, 99 F.3d at

1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  Essential to the materiality

requirement is that the new evidence relate to the time period for which benefits were denied;

evidence reflecting a later-acquired disability or the subsequent deterioration of a previous non-

disabling condition is not material.  Gullon ex rel. N.A.P.P. v. Astrue, No. 11-099ML, 2011 WL

6748498, at *10 (D.R.I. Nov. 30, 2011) (quoting Beliveau ex rel. Beliveau v. Apfel, 154 F. Supp.

2d 89, 95 (D. Mass. 2001) ("To be material, the evidence must be both relevant to the claimant's

condition during the time period for which benefits were denied and probative.")).  The plaintiff

bears the burden of demonstrating that a piece of new evidence is material.  See Evangelista, 826

F.2d at 139.

With a Sentence Six remand, the parties must return to the Court after remand to file

modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89,

98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment

until after the completion of remand proceedings.  Id.

## VI.    **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. §§ 404.1505, 416.905.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511, 416.905-911.

### A.      The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. Id. §§ 404.1520(c), 416.920(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. §§ 404.1520(d), 416.920(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. §§ 404.1520(e)-(f); 416.920(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. §§ 404.1520(g), 416.920(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

**B.      Capacity to Perform Other Work**

Once the ALJ finds that a claimant cannot return to the prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the local or national economy.  Seavey, 276 F.3d at 5.  To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id. (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given RFC or when a claimant has

a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.

In almost all of such cases, the Commissioner's burden can be met only through the use of a

vocational expert.  Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991).  It is only when the

claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a

vocational expert to establish whether the claimant can perform work which exists in the national

economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ

must make a specific finding as to whether the non-exertional limitations are severe enough to

preclude a wide range of employment at the given RFC indicated by the exertional limitations.

Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

### C.       Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility

finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986);

Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated

credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at

195.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349,

1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility

determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

testimony or the implication must be so clear as to amount to a specific credibility finding."

Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d

1251, 1255 (11th Cir. 1983)).

### D. Pain

"Pain can constitute a significant non-exertional impairment." <u>Nguyen</u>, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> 4. Treatment, other than medication, for relief of pain;
>
> 5. Functional restrictions; and
>
> 6. The claimant's daily activities.

<u>Avery</u>, 797 F.2d at 29; <u>Gullon v. Astrue</u>, No. 11-cv-099ML, 2011 WL 6748498, *5-6 (D.R.I. 2011). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A). Guidance in assessing the credibility of the claimant's statement is provided by the Commissioner's 1996 ruling. SSR 96-7p, 1996 WL 374186 (July 2, 1996). Credibility of an individual's statement about pain or other symptoms and their functional effects is the degree to

which the statement can be believed and accepted as true; in making this determination, the ALJ

must consider the entire case record and may find that all, only some, or none of an individual's

allegations are credible.  Id. at *4.  One strong indication of the credibility of an individual's

statements is their consistency, both internally and with other information in the record.  Id. at

*5-6.


**VII.**   **Application and Analysis**

**A.**     **The ALJ's Failure to List PTSD as a Severe Impairment**

Plaintiff argues that the ALJ erred because, while he found depression and anxiety, he

omitted PTSD from his list of severe impairments at Step Two.  However, PTSD is a type of

anxiety disorder; therefore, the ALJ's finding that Plaintiff's anxiety was a severe impairment

necessarily incorporates PTSD.  See DSM – IV –TR at 429, 463-67.  Since some of her treating

physicians used the label "anxiety" and others diagnosed "PTSD," the ALJ's choice of the more

inclusive label is probably the most apt approach; Plaintiff herself used the moniker "anxiety"

rather than "PTSD" both in her application and the argument of her counsel at hearing.  Tr. 29,

135.  Certainly finding reversible error based on the failure to list the lesser-included disorder

would fly in the face of the well-settled principle that remands in quest of the perfect opinion are

disfavored.  See Seymour v. Barnhart, No. 02-197-B-W, 2003 WL 22466174, at *3 (D. Me. Oct.

31, 2003) (arguable deficiency in opinion-writing not a sufficient reason for remand where

deficiency has no effect on outcome).  In any event, even if the omission is error, it is harmless in

light of the purpose of Step Two: to weed out claimants who suffer only minor impairments.

Portorreal v. Astrue, No. C.A. 07-296ML, 2008 WL 4681636, at *3-4 (D.R.I. Oct. 21, 2008) (no

error at Step Two because ALJ found other severe impairments and could consider omitted

impairment in determining RFC); see Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987)

("[T]he finding of any severe impairment, . . . whether or not it results from a single severe

impairment or a combination of impairments that together qualify as severe, is enough to satisfy

the requirement of step two.").

Plaintiff's secondary argument – that the ALJ failed to consider or discuss the impact of

PTSD on her functional abilities – badly misses the mark.  The ALJ clearly considered the

effects of PTSD when assessing her RFC and documenting his findings.  In his discussion of the

evidence, the ALJ acknowledged Plaintiff's testimony regarding PTSD symptoms and

summarized her PTSD diagnosis and treatment by Dr. Mann (depression, anxiety, anger

problems, difficulty sleeping and did not want to go anywhere by herself).  Tr. 16-17, 33, 42-44,

628-30, 633-35.  The ALJ also noted her session with Dr. Pittenger, during which she described

such PTSD symptoms as depression, anxiety, flashbacks to her sexual assault, nightmares and

"almost never" leaving the house alone.  Tr. 17, 461-62.[8]

Pivotal to the ALJ's conclusion was his finding that Plaintiff lacked credibility in

describing the limitations caused by these symptoms, a finding that is well supported by the

record, which is replete with the kinds of inconsistencies that justify an adverse credibility

finding.  SSR 96-7p, 1996 WL 374186 at *5-6.  In light of this finding, ALJ gave greater weight

to the RFC assessment of the state agency non-examining consultant, Michael Slavit, Ph.D., who

credited Plaintiff's diagnosis of PTSD, her symptoms of depression and anxiety, and her claim

that she does not like to go out alone, but also focused on record references to her relationships

and activities, including her report that she left her last job "not due to a mental health cause, but

---

[8] Notably, neither Dr. Mann nor Dr. Pittenger expressed an opinion regarding the limiting effects of PTSD.  Tr. 461-65, 628-35.

due to complications assoc[iated] with pregnancy." Tr. 18, 483 (citing Tr. 135). He concluded

that Plaintiff would be "limited by her mood and anxiety issues to tasks that are not complex,

demanding or time-pressured, but can sustain a 2-hr/8-hr sched[ule] at routine tasks" and

determined that she can "manage superficial work rel[ationship]s," "can make routine work

decisions" and "can leave the home when needed, and can arrange for her transp[ortation]." Tr.

483.

     Because the ALJ clearly considered PTSD in assessing Plaintiff's functional abilities and

his RFC determination is supported by substantial evidence, there is no error in not naming

PTSD as a stand-alone "severe impairment" at Step Two, particularly where severe anxiety is

listed. Montore v. Astrue, No-11-CV-190-SM, 2012 WL 3583346, at *4 (D.N.H. Aug. 20, 2012)

(by finding affective disorder to be a severe impairment at Step Two, ALJ necessarily found

"bipolar disorder" as it is a type of affective disorder); see also Vining v. Astrue, 720 F. Supp. 2d

126, 132 (D. Me. 2010) (failure to find PTSD severe at Step Two harmless where anxiety

symptoms considered); cf. Hernandez v. Astrue, No. CA 09-428 ML, 2010 WL 4117186, at *11

(D.R.I. Sept. 28, 2010) (omission of impairment at Step Two requires remand because ALJ did

not include limitations related to the impairment in RFC).

     **B.**    **The ALJ's Evaluation of Plaintiff's Credibility in Describing Her Pain**

     Plaintiff contends that the ALJ improperly devalued her complaints of pain. She

correctly directs this Court to the factors laid out in the relevant Social Security Ruling and

related authorities and concedes that the ALJ explored them; in arguing for remand, she

nevertheless contends that the ALJ ignored objective evidence supporting her subjective

complaints and failed to make reference to inconsistencies sufficient to discredit her credibility.

SSR 96-7p, 1996 WL 374186, at *3; Avery v. Sec'y of Health & Human Servs., 797 F.2d 19,

20-21 (1st Cir. 1986) (interpreting the standards for evaluating a claimant's allegations of disabling pain); see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (outlining the credibility analysis).

This argument is simply wrong.  While the ALJ is not required to address every single aspect of the evidence or every factor in his written decision, the assessment of credibility is for the ALJ to judge, so long as his determination is supported by substantial evidence.  Foley v. Astrue, Civil Action No. 09-10864-RGS, 2010 WL 2507773, at *7 (D. Mass. June 17, 2010); see also Acevedo Ramirez v. Sec'y of Health, Educ. & Welfare, 550 F.2d 1286, 1286 (1st Cir. 1977); Musto v. Halter, 135 F. Supp. 2d 220, 226–27 (D. Mass. 2001).  The ALJ's finding regarding Plaintiff's lack of credibility, based on observations of her, the evaluation of her demeanor and a due consideration of the "fit" of her testimony with the remainder of the credible evidence, is entitled to deference.  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).

When an ALJ decides that a claimant's subjective complaints are greater than what would be reasonably anticipated from the objective medical evidence, he must then consider the Avery factors.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 22–23 (1st Cir. 1986).  If the ALJ finds a claimant less than fully credible, SSR 96-7p only requires that the ALJ's explanation be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  SSR 96-7p, 1996 WL 374186, at *4; see also Foley, 2010 WL 2507773, at *7 (quoting same).

Here, the ALJ properly sifted Plaintiff's subjective complaints and the objective evidence, including the many inconsistencies and the results, or lack, of testing such as "x-rays,

MRI, CT scan or EMG studies."  Tr. 18.  In evaluating her back pain, he noted that the EMG

results on her back were within "normal limits" and "[t]here is no electrodiagnostic evidence of

an acute radiculopathy which we can identify electrically at this time."  Tr. 608.  While her

moderate carpal tunnel syndrome was confirmed by EMG, the ALJ noted that Plaintiff never got

physical therapy for any wrist pain and there was "no indication of thenar atrophy to support her

allegation of an inability to write or peel potatoes."  Tr. 18.  In his opinion, the ALJ contrasts

Plaintiff's subjective descriptions of pain with the testimony and record evidence of her daily

life.  Tr. 16.  Finally, the ALJ notes her testimony, critical to the issue of pain, that she only took

over-the-counter Motrin and not any prescription pain medications.  Tr. 18, 36, 42.  See Albors

v. Sec'y of Health & Human Servs., 817 F.2d 146, 147 (1st Cir. 1986) ("[T]he fact that claimant

apparently takes nothing stronger than aspirin[] supports the ALJ's rejection of claimant's

assertions of disabling pain.").

 The ALJ's explanation for discrediting Plaintiff's allegations of disabling pain is more

than "sufficiently specific" to support the weight he assigned to the evidence and the reasons for

that determination.  See SSR 96-7p, 1996 WL 374186, at *4; Foley, 2010 WL 2507773, at *7.

  **C.**  **The ALJ's Inclusion of Wrist-Immobilizing Splints while Working with Her Hands in Hypothetical**

 Plaintiff correctly argues that the medical sources do not mention whether the use of the

wrist splint prescribed in 2009 for the right wrist at night would also be appropriate for use on

both wrists while working; she argues that the ALJ, as a layperson, is not qualified to interpret

the medical evidence to make this part of the RFC determination.

 If this be error, it is harmless.

 The ALJ is not qualified to interpret raw medical data in functional terms.  Perez v. Sec'y

of Health & Human Servs., 958 F.2d 445, 446 (1st Cir. 1991).  Nevertheless, he may make

"common-sense judgments about functional capacity based on medical findings, as long as the Secretary does not overstep the bounds of a lay person's competence and render a medical judgment."  Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990). Thus, if the medical findings suggest that a claimant exhibits a moderate physical limitations, but nowhere in the record did any physician state in functional terms that the claimant had the exertional capacity to meet the requirements of a specific level of work, the ALJ would be permitted to reach that functional conclusion himself.  Id.

Plaintiff's treating physicians did not provide express functional conclusions regarding her complaints of carpal tunnel syndrome, apart from the medically-supported facts that the condition changed over time and responded well to treatment.  Tr. 399 (2001: carpal tunnel syndrome troublesome during pregnancy but resolved at birth); 400 (2007-08: carpal tunnel syndrome in right wrist moderate and responds with good result to cortisone injection); 485 (2009: post-pregnancy, carpal tunnel syndrome in right wrist severe); 612 (2010: carpal tunnel bilateral but moderate).  For treatment of her 2009 iteration, which arose post-pregnancy while nursing her child so injections could not be considered, Dr. Mann recommended a "trial" of a wrist splint worn only at night and said Plaintiff could return for a cortisone injection after she finished nursing, though she never did.  Tr. 392.  The carpal tunnel diagnosis as of the time of the hearing labeled it as "moderate."  Tr. 612.

With no medical opinion regarding any functional limitations from carpal tunnel syndrome, the ALJ turned to Plaintiff's self-reported daily activities and the opinion of the state agency consultant, including that Plaintiff is able to care for her four children, including diapering and changing a two-year-old; care for pets; shop; clean the house; and prepare meals without wrist splints or surgery.  Tr. 31, 36, 160-62, 462, 491, 493-96, 515, 597-98, 601, 633,

641-42, 644.  At the administrative hearing, Plaintiff testified that she can carry a gallon of milk

and has no problems with zippers.  Tr. 40, 42.  The state agency non-examining consultant

reviewed the record and concluded that the "totality of the evidence supports a history of R[ight]

carpal tunnel syndrome responsive to treatment with episodes of increased symptoms . . . that is

expected to be [a non-severe impairment] within 12 months of onset with treatment."  Tr. 485.

The consultant did not suggest any restrictions for lifting, fingering or grasping.  Id.; see also

Gordils, 921 F.2d at 328 (expert's report entitled to evidentiary weight).

This substantial evidence would have provided ample support for the ALJ's

determination had he concluded that Plaintiff was able to perform work without wrist braces.  In

adopting a more restrictive RFC by limiting her to work that could be performed while wearing

wrist-immobilizing splints, Plaintiff is favored and any error is harmless.  See Stain v. Astrue,

No. 2:11-CV-225-DBH, 2012 WL 1067867, at *6 (D. Me. Mar. 28, 2012) (when ALJ assigns

RFC more restrictive than what is indicated by evidence, ALJ has favored plaintiff and any error

is harmless).  The vocational expert was familiar with wrist-immobilizing splints and considered

their impact in opining that Plaintiff could perform the duties of a hand packager, production

worker and production inspector while wearing them.  Tr. 47-48.  It should be observed that

Plaintiff neither argued nor established that carpal tunnel syndrome prevents her from

performing the duties of a hand packager, production worker or production inspector without

wrist-immobilizing splints.  On this independent ground, she cannot demonstrate that the

inclusion of a wrist-brace restriction in her RFC was harmful error.  See Keating v. Sec'y of

Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (affirming that claimant not disabled

when no dispute that he could perform jobs identified by Commissioner).

While the ALJ's inclusion of the additional limitation of the wearing of wrist splints in his hypothetical was not based on the opinion of any medical source, it is the sort of common sense judgment that is permissible where, as here, no medical source opined on functional limitations.  Further, if the inclusion of this extra restriction was error, it was favorable to Plaintiff and imposed no harm.

## VIII.  <u>Conclusion</u>

The Court finds that the ALJ's discounting of Plaintiff's pain testimony and his assessment of limitations arising from her PTSD are well supported by substantial evidence and that there is no error in the omission of PTSD at Step Two.  The Court further finds that any error in including an extra limitation in the hypothetical related to carpal tunnel syndrome is harmless, and does not justify remand.  Accordingly, I recommend that Plaintiff's Motion to Reverse (ECF No. 9) be DENIED, that Defendant's Motion to Affirm (ECF No. 11) be GRANTED, and that final judgment enter in favor of Defendant.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days after the date of service.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
February 1, 2013